**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| Daniel Bell, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CSX Transportation, Inc.<br><br>Defendant. | Case No. 1:18-cv-744-MJG<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT** |

## INTRODUCTION

CSX has not demonstrated that Plaintiffs' amended complaint should be disallowed. CSX relies on inapposite legal theories, claims of factual insufficiency, and premature arguments regarding the propriety of class certification. Because Plaintiffs have properly stated claims for relief—including claims arising under the Americans with Disabilities Act—Plaintiffs' motion to amend should be granted.

## STANDARD OF REVIEW

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). A district court may deny leave to amend, however, "when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Equal Rights Center v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010). An amendment is futile "when the proposed amendment is clearly insufficient or frivolous on its face." *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 200 (4th Cir. 2014) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986)).

Here, CSX opposes Plaintiffs' proposed amended pleading solely on the grounds of futility, arguing that that the amended complaint cannot withstand a motion to dismiss. ECF 29 at 5. The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is "to test the sufficiency of [the plaintiff's] complaint." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). The Supreme Court has articulated the proper framework for analysis:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).

In evaluating a motion to dismiss, courts must remain faithful to several important background principles. *First*, a motion to dismiss does "not impose a probability requirement at the pleading stage." *Id.* at 556. Rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id. Second*, "[s]pecific facts are not necessary." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). Instead, the pleading need only " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' " *id.*, and "raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Twombly*, 550 U.S. at 556. A complaint "need not plead facts sufficient to establish a prima facie case." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017). *Third*, the

court must accept all non-conclusory facts alleged in the complaint as true and draw all reasonable inferences in the pleader's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). A reasonable inference supporting liability "need not be 'as compelling as any opposing inference' one might draw from the same factual allegations." *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013). Rule 8 "does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct." *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). *Fourth*, the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible[.]" *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 680 (D. Md. 2012) (quoting *Braden*, 588 F.3d at 594); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Finally, this Court must evaluate each of CSX's futility arguments independently. "When certain claims in the amended complaint are futile but other claims survive, courts have denied leave to amend in part with respect to the futile claims while allowing leave to amend in part with respect to the surviving claims." *See Henok v. Chase Home Fin., LLC*, No. 12–292, 2013 WL 151173, at *2 (D.D.C. Jan. 15, 2013).

## ARGUMENT

## I. PLAINTIFFS' FMLA CLAIMS ARE PROPERLY PLED AS A CLASS ACTION.

Plaintiffs have properly pled this case as a class action.

### A. Plaintiffs Have Not Pled a Fail-Safe Class.

CSX's continued insistence that Plaintiffs are attempting to maintain a fail-safe class misapprehends both the teachings of Rule 23 and the facts of this case.

A so-called fail-safe class is "a class that cannot be defined until the case is resolved on its merits." *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (citing

*Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)). For example, a class defined as "all consumers negligently harmed by the products of Company X" would be an impermissible fail-safe (at least in a case alleging negligence) because the *only way* to determine membership in the class would be by first determining liability for each class member. Fail-safe classes are typically impermissible because they would "permit plaintiffs to circumvent res judicata and basically rig the certification process so that they cannot lose." *See Hurt v. Shelby County Bd. of Educ.*, No. 2:13–CV–230–VEH, 2014 WL 4269113, at *8 (N.D. Ala. Aug. 21, 2014). "That is, '[e]ither the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment.'" *Id.* (quoting *Randleman*, 646 F.3d at 352). "'A fail-safe class thus creates a 'heads I win, tails you lose' situation, where class members either receive a favorable judgment or are defined out of the class.'" *Id.* (quoting Erin L. Geller, *The Fail–Safe Class As an Independent Bar to Class Certification*, 81 Fordham L. Rev. 2769, 2771 (2013)).

As should be obvious, Plaintiffs here propose nothing of this sort. The parties—and the Court—can easily ascertain the current and former CSX employees who, pursuant to CSX's policy, were terminated or suspended for using (or as CSX maintains, misusing) FMLA leave *before* making any determination as to liability. And those class members will be bound by the judgment of this Court—win or lose. CSX makes some creative semantic arguments to avoid this point, arguing, for example, that "[e]mployees who fraudulently take FMLA leave are not dismissed for using (or 'misusing') FMLA leave; they are dismissed for dishonesty." ECF 29 at 11. This, in short, is nonsense, and CSX's own words and conduct amply prove the point. To highlight just one example, CSX told Plaintiff Daniel Bell that he was under investigation for allegedly "misus[ing] FMLA leave between December 22, 2017 and December 26, 2017." Thompson Dec., Ex. A. CSX later terminated Bell for "misus[ing] FMLA leave." Thompson Dec.,

Ex. B. All other Plaintiffs received letters using substantially the same language. Thompson Dec., Ex. C. CSX now apparently resists the conclusion that an employee can "use" FMLA leave for both lawful and unlawful reasons. ECF 29 at 11. But outside the context of its current litigation gymnastics, CSX understood the point just fine. In a 2016 note sent to all employees, CSX's Vice President and Chief Operating Officer wrote that "[u]sing FMLA leave to avoid certain work assignments, to extend time off (e.g., next to rest days, vacation days, etc.), to be off on a holiday, the weekend, or to avoid working overtime is considered not only misuse, but fraudulent use of this federally required benefit." Thompson Dec., Ex. D.

Plaintiffs propose a class of individuals who—semantics aside—all agree were punished for using FMLA leave. ECF 20-4 at 66. CSX concedes that it "charged approximately 140 . . . employees, including Plaintiffs, with dishonesty for using FMLA leave in order to avoid working on a holiday," ECF 15-1 at 15, and "a majority of the[se] employees . . . were suspended or terminated." ECF 12 ¶ 55. Moreover, these employees were punished pursuant to a uniform and centralized corporate policy. For each affected employee, CSX relied on a deeply flawed aggregate statistical analysis that purported to analyze the patterns of FMLA leave usage across CSX's entire workforce of train conductors and engineers and identify fraud. Thompson Dec., Ex. E. In light of this evidence, there is no question that the proposed class can be readily—indeed easily—ascertained before determining liability and therefore presents none of the problems of a fail-safe class.

CSX objects on the grounds that Plaintiffs' proposed class definition would cover not just employees who were explicitly punished for using FMLA leave but also "employee[s] who claim[] to have been disciplined for using FMLA leave, even if CSXT's stated reason for disciplining [them] had nothing to do with the FMLA." ECF 29 at 11. But CSX's objection is both hypothetical

and premature. At this stage, there is no evidence that any employees were secretly punished for using FMLA leave. If discovery confirms that no such employees exist, then the class will naturally be limited to employees who, *on the face of CSX's records*, were punished for using FMLA leave. In the unlikely event that discovery reveals that the group is broader, then Plaintiffs will bear the burden of identifying an administratively feasible mechanism for identifying these additional class members before trial. If no means exist to do so, then such employees will be excluded from the class.

All of this reinforces a final point: "Courts have discretion to modify proposed class definitions to make it administratively feasible to determine class membership." *Piotrowski v. Wells Fargo Bank, NA*, No. DKC 11–3758, 2015 WL 4602591, at *5 (D. Md. July 29, 2015) (quoting *Givens v. Van Devere, Inc.*, No. 5:11CV666, 2012 WL 4092738, at *15 (N.D. Ohio Sept.17, 2012)); *cf. Brown v. Nucor Corp.*, 785 F.3d 895, 901 (4th Cir. 2015) ("Rule 23(c)(1)(C) provides a district court with broad discretion to alter or amend a prior class certification decision at any time before final judgment."). And in the context of fail-safe classes, courts caution that any problems "should be solved by refining the class definition rather than by flatly denying class certification" or striking the proposed class. *See Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012) (citing cases). The cases cited by CSX reinforce the point that courts should decline to modify the class definition only when there is no plausible way to fix the fail-safe class definition. *E.g.*, *Nevada-Martinez v. Ahmad*, No. 5:15-cv-239-JMH, 2016 WL 7888046, at *6 (E.D. Ky. June 17, 2016) (declining to amend the class definition because "the Court can fathom no potential factual developments which would offer hope of" fixing the fail-safe class); *Sherrod v. Enigma Software Group USA, LLC*, No. 2:13-cv-36, 2016 WL 25979, at *4 (S.D. Ohio

Jan. 4, 2016) ("The Court . . . cannot conceive of an amendment that would solve the fail-safe problem . . . .").

If the Court perceives any problem with Plaintiffs' proposed classes, the Court should modify the class definitions (for example to include only current and former CSX employees who, on the face of CSX's records, were terminated or suspended for allegedly misusing FMLA leave), not strike the class entirely. But the better approach is to allow the existing class definitions to stand, proceed to discovery, and reevaluate any arguments CSX wishes to raise at the class certification stage and with the benefit of a developed factual record.

**B. Plaintiffs' Proposed Class Is Not Facially Overbroad.**

CSX's claim that Plaintiffs' FMLA Discipline or Termination class is overbroad in temporal scope remains misplaced.

CSX essentially asks this Court to accept—at the pleadings stage—the factual conclusion that its pattern and practice of punishing employees for taking FMLA leave began in 2017. There is no basis to accept that conclusion at this early stage. CSX's "arguments are [therefore] premature." *See Banks v. Wet Dog, Inc.*, No. RDB–13–2294, 2014 WL 4271153, at *4 (D. Md. Aug. 28, 2014). Courts typically "reserve their analysis of the propriety of a proposed class until the plaintiffs move for class certification." *See MAO-MSO Recovery II, LLC v. Gov't Emp. Ins. Co.*, Nos. PWG-17-711, PWG-17-964, 2018 WL 999920, at *14 (Feb. 21, 2018); *Quickley v. Univ. of Md. Med. Sys. Corp.*, 2012 WL 4069757, at *8 (D. Md. Sept. 14, 2014) (same). The Court should do the same here.

CSX's contention that Plaintiffs lack "standing," ECF 29 at 11, to maintain a class covering all employees affected by CSX's common policy within the statute of limitations is wrong even on its own terms. CSX "confuses the requirements of Article III and Rule 23 of the Federal Rules

of Civil Procedure, which govern standing and the certification of class actions, respectively." *See Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 421 (6th Cir. 1998). To evaluate Article III standing, courts focus solely "on the allegations of personal injury made by the named plaintiff[s]." *Dreher v. Experian Information Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017). Plaintiffs, who were all punished by CSX for using FMLA leave, unquestionably have standing to sue under Article III. The question of whether Plaintiffs, as class representatives, may maintain a class covering a certain time period depends on whether Plaintiffs "plausibly allege" that their own experiences "implicate[] the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *See NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012). Plaintiffs have done so here.

## II. CSX'S ATTENDANCE POLICY VIOLATES THE FMLA.

Plaintiffs' amended complaint demonstrates that CSX's CAPS attendance policy violates the FMLA.

CSX continues to rely solely on an inapposite regulation that governs the administration of benefits to employees who are transferred to an equivalent position. As Plaintiffs explained in response to CSX's motion to dismiss, that regulation has nothing to do with CSX's attendance policy. The regulation cited by CSX governs whether a "bonus or other payment" must be provided to an employee to satisfy the statutory requirement of "equivalent pay." 29 C.F.R. § 825.215(c)(2). But CSX's refusal to grant employees who rely on FMLA leave eligibility to reduce their negative attendance points is not the award of a "bonus or other payment." *Id.* It is "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions"—conduct which the regulations forbid. 29 C.F.R. § 825.220(c). Similarly, the regulation cited by CSX operates solely to define the statutory phrase "[e]quivalent pay." *See* 29 C.F.R. §

825.215(c). That phrase appears in the statute only in the context of giving employers the option of requiring employees who need intermittent FMLA leave "to transfer temporarily to an *available alternative position* offered by the employer . . . ." 29 U.S.C. § 2612(b)(2) (emphasis added); *see also* 29 U.S.C. § 2618(c)(1)(B) (regulation governing the transfer of "instructional employees" to alternative positions). Employers may require such a transfer only where the alternative position "has equivalent pay and benefits." 29 U.S.C. § 2612(b)(2)(A). By its plain terms, the regulation cited by CSX has no application to employees who remain in their original positions while using intermittent FMLA leave. Under the terms of the statute, the "equivalent pay" regulation only operates upon employees who are shifted to an "available alternative position." *Id.* And Plaintiffs all remained in their original jobs while using intermittent FMLA leave. ECF 20-4 ¶¶ 83-535.

And even assuming that CSX's attendance policy's withholding of attendance points qualified as a "bonus" or "other payment," and assuming further that the regulation had any application to employees who remained in their original positions, the regulation still would not save CSX because the company's attendance policy discriminates against FMLA leave. The regulation provides that an employer may not withhold the bonus or payment if the bonus or payment is "otherwise paid to employees on an equivalent leave status for a reason that does not qualify as FMLA leave." 29 C.F.R. § 825.215(c)(2). As explained in Plaintiffs' opposition to CSX's motion to dismiss, CSX's CAPS policy violates this nondiscrimination principle. ECF 15-15 at 2; ECF 20-4 ¶ 71. An employee who takes leave for "approved vacation," "personal leave," "jury duty," "work-related illness or injury with valid doctor's note" or "bereavement leave,"

among others, maintains his eligibility to remove negative points from his record. ECF 15-15 at 2; ECF 20-4 ¶ 71. CSX concedes that some of these forms of leave are unpaid. ECF 15-11 at 5.

CSX argues that these other, preferred forms of leave do not qualify as "equivalent leave" within the meaning of the regulation. ECF 29 at 12; 29 C.F.R. § 825.215(c)(2). But CSX cites no authority for that point, and common sense refutes the argument. "Equivalent leave status refers, for example, to vacation leave, paid time-off, or sick leave." 73 Fed. Reg. at 67985. By its own admission, CSX treats precisely these equivalent forms of leave more favorably than FMLA leave. Demand Days Off, for example, is just a type of unpaid leave—no different than unpaid FMLA leave except for its favored status under CSX's policy. ECF 29 at 12. The same is true for leave taken for a "work-related illness or injury." ECF 15-15 at 2; ECF 20-4 ¶ 71. CSX insists that "absences for work-related illness or injury qualify as FMLA leave." ECF 29 at 12. But that is not necessarily so; most ordinary work-related illnesses or injuries will not rise to the level of "a serious health condition that makes the employee unable to perform the functions" of the employee's position—a prerequisite to invoke the FMLA's protections. 29 U.S.C. § 2612(a)(1); 29 C.F.R. § 825.113 (further defining "serious health condition"). An employee who, for example, cuts his hand on the job and needs one day of medical treatment and two additional days of rest before returning to work would not qualify as an individual with a serious health condition under the FMLA. *See* 29 C.F.R. § 825.113-.115 (defining serious health condition as requiring (1) "an overnight stay in a . . . medical care facility," (2) a condition involving a "period of incapacity of more than three consecutive, full calendar days" involving in-person "[t]reatment by a health care provider on at least one occasion," (3) "incapacity due to pregnancy, or for prenatal care," (4) treatment for "chronic conditions," (5) treatment for "permanent or long-term conditions," or (6) "conditions requiring multiple treatments.") Yet that employee would remain eligible for a

reduction in negative attendance points under CSX's policy. A fellow employee who uses FMLA leave to receive chemotherapy treatments four days a month or attend to the birth of his child would not be eligible to reduce his negative points. The goal of the "equivalent pay" regulation is to "put[] employees who take FMLA leave on equal footing with employees who take leave for non-FMLA reasons." 73 Fed. Reg. at 67985. CSX's policy does exactly the opposite, systematically punishing FMLA leave—while carving out nearly every other form of leave—with the purpose and effect of ultimately removing employees who rely on FMLA leave from CSX's workforce.

Although CSX makes no attempt to develop the argument, it alleges in passing that Plaintiffs "have failed to allege any harm arising from" CSX's CAPS policy. ECF 29 at 18. Not so. While it is certainly true that plaintiffs are not entitled to symbolic victories for technical violations of the Act, *see, e.g.*, *Dawson v. Leewood Nursing Home, Inc.*, 14 F. Supp. 2d 828, 833 (E.D. Va. 1998), "[t]here is a substantial difference between an employer committing a technical violation of the FMLA and the employer's wholesale enforcement of policies which violate the FMLA." *See Harcourt v. Cincinnati Bell Tel. Co.*, 383 F.Supp.2d 944, 962 (S.D. Ohio Aug. 18, 2005). "[A]n employer violates the FMLA by discouraging or chilling employees from exercising their FMLA rights." *Id.* Here, Plaintiffs have plausibly alleged that CSX's CAPS policy discouraged their lawful use of FMLA leave. Indeed, the evidence will show many Plaintiffs were put to a Hobson's Choice—between taking needed FMLA leave or working through serious health

conditions. And "even assuming Plaintiffs have no economic damages . . . Plaintiffs have incurred injuries which would entitle them to [declaratory and] injunctive relief." *Id.* at 963.

## II. PLAINTIFFS WILL AGREE TO DISMISS THEIR CLAIMS ALLEGING THAT CSX MISCACULATES FMLA LEAVE.

After careful study of the evidence submitted by CSX, Plaintiffs will agree to dismiss their FMLA claims alleging that CSX miscalculates FMLA leave. In their opposition to CSX's motion to dismiss, Plaintiffs stated that they could not determine the legality of CSX's method of calculation without additional evidence, specifically CSX's "methodology for converting hours into weeks—a critical piece of information that [was] conspicuously absent from CSX's description of its leave formula." ECF 23 at 16-17. In a supplemental declaration filed in opposition to Plaintiffs' motion to amend, CSX has supplied that evidence. *See* ECF 29-1. According to the sworn declaration of Jolanda Johnson, CSX charges employees for 1/7th of a week of FMLA leave for every 24 hours employees mark up for FMLA leave. *Id.* CSX was perhaps reticent to describe its policy in such transparent terms[1] because doing so underscores the fact that CSX's pre-2016 policy likely violated the FMLA. Prior to January 1, 2016, CSX charged employees for *1/5th of a week* of FMLA leave for every 24 hours employees marked up for FMLA leave. ECF 15-3 at 4-5. The prior policy overcharged employees for taking FMLA leave; an employee who took five consecutive days off would be charged with taking an entire week of leave, even if he worked on the sixth or seventh days of the same week. *Id.* Conversely, an employee who marked off for seven 24-hour periods of leave would be charged with using 1.4

[1] Indeed, CSX's description of its own current policy is unnecessarily opaque. For example, CSX's methodology of dividing the total number of hours marked off by three in order to yield an eight-hour workday is mathematically irrelevant to CSX's ultimate mode of calculation. The ultimate metric contemplated by the FMLA is *workweeks*; and CSX's witnesses attest, albeit in a roundabout way, that CSX charges employees 1/168 workweeks of FMLA leave for every hour marked off. *See* ECF 29-1.

workweeks of leave. *Id.* Nevertheless, Plaintiffs will agree to drop their FMLA miscalculation claims, even as applied to CSX's pre-2016 policy. Plaintiffs are principally concerned with ensuring that CSX's method of calculating FMLA leave operates lawfully on a prospective basis.

## III. PLAINTIFFS HAVE ADEQUATELY PLED THEIR CLAIMS ARISING UNDER THE AMERICANS WITH DISABILITIES ACT.

CSX raises a kitchen sink's worth of arguments in opposition Plaintiffs' routine motion to assert their claims arising under the Americans with Disabilities Act (ADA) following the administrative exhaustion of those claims. None of CSX's argument supports denying the motion to amend.

### A. Plaintiffs Have Adequately Pled that They Are Disabled within the Meaning of the ADA.

Eighteen Plaintiffs (for clarity, referred to here and in the proposed amended complaint as the "ADA Plaintiffs"), have asserted claims arising under the ADA. Their disabilities are not a mystery to CSX. Indeed, CSX is intimately familiar with the disabilities of the ADA Plaintiffs, as they all submitted detailed annual medical certifications to CSX. CSX has therefore failed to demonstrate that Plaintiffs' ADA claims would be futile.

"Nearly one in every five Americans has a disability." *See Hostettler v. College of Wooster*, --- F.3d ----, 2018 WL 3432244, at *1 (citing Matthew W. Brault, U.S. Census Bureau, Americans With Disabilities: 2010 4 (2012). Congress passed the Americans with Disabilities Act in 1990 to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(8) (pre-2008 amendments). "But years of court decisions narrowly defining who qualifies as an individual with disabilities left the ADA too compromised to achieve its purpose." *Hostettler*, 2018 WL 3432244, at *1. Congress responded by passing the ADA Amendments Act of 2008 (ADAAA) to invalidate those decisions

and to "restore the intent and protections of the Americans with Disabilities Act." Pub. L. No. 110–325, 122 Stat. 3553.

As amended, the ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). In keeping with the remedial purposes of the ADAAA, "[t]he definition of disability" under the ADA "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). That is because the primary concern of the ADA is "whether covered entities have complied with their obligations and whether discrimination has occurred," not whether an individual's impairment is a disability. 29 C.F.R. § 1630.2(j)(1)(iii).

Major life activities include, but are not limited to, sleeping, caring for oneself, speaking, breathing, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A). And "the term 'major' shall not be interpreted strictly to create a demanding standard." 29 C.F.R. § 1630.2(i)(2). To determine whether a disability substantially limits major life activities, the regulations direct courts to compare the person claiming a disability to "most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "An impairment need not prevent, or significantly or severely restrict ... a major life activity" to be substantially limiting. *Id.* Like the term "major life activities," "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

CSX's motion rests on the mistaken assumption that Plaintiffs must describe their disabilities in detail. But such "[s]pecific facts are not necessary." *Erickson*, 551 U.S. at 93 (citing *Twombly*, 550 U.S. at 555). Instead, the pleading need only " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' " *id.*, and "raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Twombly*, 550 U.S. at 556.

Plaintiffs have met this standard. In fact, as explained in Plaintiffs' complaint, CSX has in its possession a great deal of information relating to the serious health conditions of Plaintiffs as each Plaintiff submitted detailed certifications prior to taking FMLA leave.

CSX is correct, of course, that the ADA's definition of disability and the FMLA's definition of serious health condition are not coextensive. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 388 (4th Cir. 2001). But neither are the two concepts unrelated, as CSX would have it. The FMLA covers, for example, "chronic serious health condition[s]," which require periodic medical treatment and causes "episodic rather than a continuing period of incapacity." 29 C.F.R. § 825.115. The ADA defines disability, in part, as an impairment that "substantially limits one or more major life activities," including "working." 42 U.S.C. § 12102(1)(A), (2)(A). Each of the ADA Plaintiffs has provided CSX with detailed medical certifications, most of which address chronic anxiety or depression, among other conditions. *See Davidson v. Sarnova, Inc.*, No. JKB-17-1067, 2017 WL 5564654, at *4 (D. Md. Nov. 20, 2017) (denying a motion to dismiss where the relevant factual content is "within the possession and control of Defendant, and the allegation is plausible given the context provided by Plaintiff's specific factual allegations"). The ADA Plaintiffs have adequately pled that they are disabled within the meaning of the ADA. *See Johnson v. Baltimore City Police Dept.*, No. ELH–12–2519, 2014 WL 1281602, at *15 (D. Md. Mar. 27, 2014) (plaintiff plausibly alleged she was disabled when she alleged that she was "substantially limited" in "numerous major life activities, including but not limited to lifting, reaching, pushing, pulling, and running.").

### B. Plaintiffs Have Adequately Pled that CSX Disciplined Them Because of Their Disabilities.

Plaintiffs have plausibly alleged that CSX punished them because of their disabilities. CSX argues that "the essence of their claims is that CSXT treated employees taking FMLA leave

differently than employees who did not take FMLA leave" and therefore "Plaintiffs cannot show that, but for their alleged disabilities, they would not have been disciplined." ECF 29 at 21-22. But CSX confuses the concepts of *motive* and *causation*. Although CSX acted out of hostility to its employees use of the FMLA, CSX chose to punish the very employees who rely upon the FMLA most: the disabled. According to CSX's logic, an employer who wished to chill the use of FMLA leave and chose to do so by terminating all female employees who used the FMLA for pregnancy-related serious health conditions would be liable for violating the FMLA but not for engaging in pregnancy discrimination. Such conduct, of course, would violate both provisions. It would restrain the employees' rights under the FMLA; at the same time, pregnancy would be a but-for cause of the employees' termination. Plaintiffs' claims run in parallel to this example. The ADA Plaintiffs have plausibly alleged that but for their disabilities CSX would not have singled them out for punishment. CSX suggests that "Plaintiffs may argue that because they took FMLA leave for an alleged disability, any discipline for taking FMLA leave is, by extension, disability discrimination," but the point is red herring. ECF 29 at 22. Plaintiffs do not conflate liability under the FMLA and ADA. Rather, they allege that CSX engaged in an unlawful campaign to purge employees who relied on the FMLA's protections, and but-for their disabilities the ADA Plaintiffs would not have been punished. Nothing more is required.

### C. Plaintiffs Have Adequately Pled that CSX's Attendance Policy and Discipline Regime Had a Disparate Impact on Disabled Employees.

Plaintiffs have adequately alleged that CSX's attendance policy and discipline of employees who took FMLA leave had a disparate impact on disabled employees.

The ADA defines disability discrimination to include "utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability" and "using qualification standards, employment tests or other selection criteria that screen out or tend

to screen out an individual with a disability or a class of individuals with disabilities[.]" 42 U.S.C. § 12112(b)(3), (6). To prove a prima facie disparate impact claim under § 12112(b)(6) of the ADA a plaintiff must (i) identify the challenged employment practice or policy, (ii) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (iii) demonstrate a causal relationship between the identified practice and the disparate impact. *See Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834 (5th Cir. 1999).

Plaintiffs here have plausibly alleged all three elements. *First*, Plaintiffs have identified two discrete employment practices: (1) CSX's CAPS attendance policy and (2) CSX's de facto policy of suspending and terminating employees who rely on FMLA leave. *Second*, Plaintiffs have adequately pled that both practices had an adverse impact on CSX's disabled employees and that CSX's practices caused the disparate impact. CSX's contrary argument essentially faults Plaintiffs for not proving their case at the pleadings stage. But Plaintiffs are "not required to establish [that they] can prove [their] case of discrimination at the pleadings stage." *See Tilton v. GlaxoSmithKline, LLC*, No. 14–1267, 2014 WL 4105989, at *2 (E.D. Penn. Aug. 21, 2014). Indeed, no plaintiff could prove a disparate impact class claim at the pleadings stage. Such claims often rely on statistical evidence, developed during discovery, demonstrating that the challenged practices negatively affect disabled employees. Plaintiffs' amended complaint gives CSX fair notice of the challenged practices and describes how those practices discriminate against disabled employees. CSX is entitled to nothing more at the pleadings stage. *Erickson*, 551 U.S. at 93.

### D. Plaintiffs Need Not Allege that They Exhausted Their Administrate Remedies.

Perhaps CSX's most groundless argument is its contention that Plaintiffs have failed to exhaust their administrative remedies. The argument suffers from several glaring flaws.

First, "[a]n ADA plaintiff's failure to exhaust administrative remedies is an affirmative defense. A plaintiff is not required to plead or demonstrate exhaustion at the pleading stage." *See Williams v. Rosenblatt Securities Inc.*, 5136 F.Supp.3d 593, 608 (S.D.N.Y. 2015) (citing *DiPetto v. U.S. Postal Serv.*, 383 Fed. Appx. 102, 104 (2d Cir. 2010)). Plaintiffs are "under no obligation to plead facts in the complaint to" rebut CSX's affirmative defense. *See Blackstone v. St. Mary's Cty. Sheriff's Office*, No. DKC 13–3809, 2014 WL 3891688, at *3 (D. Md. Aug. 6, 2014).

Second, CSX knows full well that the ADA Plaintiffs have exhausted their administrative remedies. CSX admits as much in its briefing. ECF 29 at 25. Raising the argument as a ground for dismissal serves no purpose other than to multiply the proceedings and create unnecessary work for the parties and the Court.

Third, CSX's contention is false. The right to sue letters for the ADA Plaintiffs are attached to this filing. Thompson Dec., Ex. F.

**E. Plaintiffs Have Properly Pled Their ADA Claims as a Class Action.**

Finally, CSX's arguments that Plaintiffs cannot maintain their ADA claims as a class action are meritless.

A motion to dismiss or strike class action allegations before discovery is an extreme and rarely granted remedy. Plaintiffs must be permitted to develop the factual record fully in order to meet their burden under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) of showing that the case can be certified under Rule 23. This Court should defer ruling on class certification until Plaintiffs have obtained adequate discovery.

Even if the Court is inclined to rule on the merits of Defendant's motion, the First Amended Complaint is plainly sufficient under Rule 12. Plaintiffs have alleged ADA claims premised on violations of two discrete and uniform policies which give rise to common questions ideal for class

resolution. Contrary to Defendant's assertion, the fact that some issues will be decided through separate proceedings does not, as matter of law, defeat class certification. Courts commonly use the tools available under Rule 23 and the *Teamsters* framework to manage class actions challenging discriminatory employment practices. The Court can do the same here.

**(1) CSX's Attacks on Plaintiff's Proposed Classes Are Premature.**

"Striking a plaintiff's class action allegations prior to discovery and the class certification stage is a rare remedy." *Weatherly v. Michael Foods, Inc.*, 2008 WL 5110917, at *3 (D. Neb. Dec. 2, 2008); *see also Sherrard v. Boeing Co.*, 2013 WL 5786642, at *3 (E.D. Mo. Oct. 28, 2013) (noting that this was not the "rare case" in which it was appropriate to dismiss class claims at the pleading stage). Instead, "it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied[.]"*Weatherly*, 2008 WL 5110917, at *4. This is especially true under the standards set out by the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). As courts have recognized, *Wal-Mart* "illustrates the need to develop the record fully before a class [certification] motion is considered[.]" *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 298 (S.D.N.Y. 2012); *accord Lindell v. Synthes USA*, 2013 WL 3146806, at *4 (E.D. Cal. June 18, 2013). This Court should deny the present motion and any future motion by which CSX seeks to dismiss class claims before adequate discovery has been completed.

**(2) This Case May Properly Be Maintained as a Class Action Under Rule 23.**

Even if this Court were inclined to consider the merits of Rule 23 certification at this early stage, class action treatment would be proper. The class action device "saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)

(quotations and modifications omitted). Contrary to the view advocated by CSX, Rule 23 is not rigid and inflexible, and does not require that every issue be capable of resolution in one proceeding. As set forth below, the rule provides numerous tools that courts employ to manage class actions involving both common questions and individual issues.

**a. The Rule 23 requirements for class certification.**

**(i) Rule 23(a).**

Every certified class action must meet the prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23. Relevant here, the commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." All questions need not be common; even a single common question will do. *Wal-Mart*, 564 U.S. at 359. What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350. There must be a contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

**(ii) Rule 23(b).**

A class action must also be maintainable under Rule 23(b). Under Rule 23(b)(2), a class may be certified if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2) applies when a single injunction can provide relief to each member of the class. *Wal-Mart*, 564 U.S. at 360. Although Rule 23(b)(2) does not incorporate the predominance requirement, the Eighth Circuit requires that "class claims thereunder still must be cohesive." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010). Individual monetary awards are usually not available under this rule. *Wal-Mart*, 564 U.S. 361-62

Claims involving individual money damages are typically certified under Rule 23(b)(3). A class may be certified if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Individual questions are those where class members "will need to present evidence that varies from member to member," while common questions are those where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (quotations and modifications omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 136 S. Ct. at 1045.

**b. Additional tools for managing class actions.**

Courts employ additional tools to manage class actions that involve both claims for class-wide injunctive relief and individual monetary relief. These are commonly referred to as "hybrid" class actions. *See* 2 W. Rubenstein, Newberg on Class Actions § 4:38 (5th ed. 2012). One option is to certify a Rule 23(b)(2) class for injunctive relief, and also a separate class under Rule 23(b)(3) for claims involving money damages. *Id.* A second option is to bifurcate the litigation into liability and damages phases. In the first phase, the defendant's liability is determined through certification

of a Rule 23(b)(2) class, or an issue class under Rule 23(c)(4). *Id.* Rule 23(c)(4) allows the court to certify a class "with respect to particular issues." Relatedly, Rule 23(c)(5) allows the court to divide the class into subclasses for manageability purposes. If the defendant is found liable, the court then decides whether to certify a class under Rule 23(b)(3) for monetary damages. Newberg, § 4:38

The use of this sort of hybrid certification, insulating the (b)(2) class from the money-damage portion of the case, is an available approach that is gaining ground in class action suits." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016). Likewise, the use of Rule 23(c)(4) to certify issue classes, or at minimum liability-only classes, has been approved by the Fourth Circuit. *See Gunnells v. Healthplan Servs. Inc.*, 348 F.3d 417, 428 (4th Cir. 2003) (citing the Rule 23(c)(4) Advisory Committee notes and explaining that Rule 23 "explicitly" envisions class actions with individualized damages determinations).

**c. The *Teamsters* model of litigating discrimination class actions.**

As explained in Plaintiffs' opposition to CSX's motion to dismiss, the options described above are consistent with the model for litigating class discrimination cases established by the Supreme Court in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), and explicitly reaffirmed in *Wal-Mart*. *See* 564 U.S. at 366 (outlining the procedure for litigating pattern-or-practice discrimination cases).

Under the *Teamsters* framework, the plaintiff has the initial burden "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer[.]" 431 U.S. at 360. In other words, discrimination was "standard operating procedure,"—the regular, rather than the unusual practice. *Id.* at 336. At this initial liability stage, the plaintiff "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the

employer's discriminatory policy." *Id.* at 360. "[The] burden is to establish a prima facie case that such a policy existed." *Id.* "The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." *Id.* If the plaintiff prevails at the initial stage, the court can conclude that a violation has occurred and issue the appropriate remedy—usually injunctive relief. *Id.* at 361.

"When the [plaintiff] seeks individual relief for the victims . . . a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Id.* at 361. Proof of the pattern or practice typically "supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The burden is on the employer to show that the particular employment decisions at issue were made for lawful reasons." *Id.*

**d. Plaintiffs' Claims May Be Brought Under Rule 23.**

At this early stage of the litigation, as discovery has just begun, Plaintiffs' pleadings are sufficient to satisfy Rule 12. Plaintiffs challenge two discrete policies—promulgated at the highest levels of the company and carried out uniformly by a small team of decision-makers—which led to widespread violations of the Americans with Disabilities Act. Each of Plaintiffs' class claims are premised on these policies, and each give rise to common questions ideal for resolution as a class action.

Contrary to CSX's assertion, the fact that some issues will need to be decided through separate proceedings does not, as matter of law, defeat class certification. Court commonly use the tools available under Rule 23 and the *Teamsters* framework to manage class actions challenging discriminatory employment practices.

**(i) Plaintiffs' Improper Discipline claims are well suited to class treatment.**

Plaintiffs' Improper Discipline Claims are well suited to class treatment under the *Teamsters* framework. As previously discussed, CSX relied on a deeply flawed aggregate statistical analysis that purported to analyze the patterns of FMLA leave usage across CSX's entire workforce of train conductors and engineers. Thompson Dec., Ex. E. A factfinder could rely on this same evidence in determining that CSX engaged in a pattern or practice of discriminating against disabled employees.

Indeed, courts have approved of the *Teamsters* model to litigate similar ADA cases, as well as other employment class actions involving "individual" issues. *See Employees Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 427-32 (W.D.N.Y. 2005) (finding hostile work environment claims compatible with the pattern-or-practice framework); *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 448-49 (N.D. Cal. 2001) (certifying ADA disability discrimination class action under *Teamsters*-type framework); *see also E.E.O.C. v. Nw. Airlines, Inc.*, 216 F. Supp. 2d 935, 938 (D. Minn. 2002) (approving *Teamsters* approach in EEOC action alleging pattern-or-practice disability discrimination); *E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1069-070 (C.D. Ill. 1998) (approving *Teamsters* approach in EEOC action alleging pattern-or-practice claims of hostile work environment).

The *Bates* decision is instructive. There, workers who used sign language brought a class action against their employer for ADA violations. *Bates*, 204 F.R.D. at 442. Specifically, the plaintiffs objected to the company's use of DOT hearing standards which precluded assessment of whether individual employees can perform the essential functions of the job, failure to develop interactive policies to address communication barriers, and institution of an illegal "glass ceiling" for workers with hearing-related disabilities. Id. The plaintiffs sought class certification, proposing a bifurcated trial in which liability and injunctive relief would be decided first, followed by a second phase addressing damages. *Id.* at 443.

The court granted class certification. *Id.* at 448. Addressing the employer's objection to bifurcation, the court noted the different types of evidence that would be used at each stage of the proceedings. *Id.* at 448-49. The court explained that the plaintiffs had alleged a pattern-or-practice of discrimination, not the failure to make particular accommodations in individual cases. *Id.* Accordingly, in the first phase, liability and injunctive relief would depend on questions related to the policies and practices the company had employed. *Id.* Only at the second/damages phase would there be a need consider individualized evidence such as "each individual's need for accommodation, considering his or her particular limitations and essential job functions, what accommodations he or she was offered and how they were inadequate, if at all, what other reasonable accommodation was available, and the additional evidence of intent relevant to a determination of punitive damages." *Id.* The court concluded that "[s]uch evidence is certainly necessary to evaluate damages, but it is not required to determine liability[.]" *Id.*

The same point was driven home in *E.E.O.C. v. Nw. Airlines, Inc.* The EEOC brought a pattern-or-practice ADA claim, alleging that the employer's medical examination policy illegally screened out workers with insulin-dependent diabetes and anti-seizure medicated epilepsy. 216 F. Supp. 2d at 936. The employer moved to dismiss arguing, among other things, that "individualized inquiries are necessary to determine disability." *Id.* at 938. The district court found this argument inapplicable because "the EEOC has charged NWA with having an illegal policy, as opposed to a few isolated incidents of discrimination." *Id.* The court explained that since the case was brought as a pattern or practice under *Teamsters,* the EEOC could establish a prima facie case of pattern-or-practice discrimination at the initial liability stage "without offering evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* "Rather, a court may conduct additional proceedings to determine the scope of such individual relief and damages." *Id.*

This makes perfect sense. During stage one, the *Teamsters* framework is focused on the policy or practice at issue, not on which members of the class suffered harm. *See Teamsters*, 431 U.S. at 336.

The plaintiffs' burden is "to establish a prima facie case that such a policy existed." *Teamsters*, 431 U.S. at 336. It is not to prove the elements of each and every class member's individual discrimination claims. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) ("[A]t the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking."); *see also Amgen*, 133 S. Ct. at 1196 (noting that a class action plaintiff is "not required to prove that each element of her claim is susceptible to classwide proof.").

These decisions reaffirm that under the *Teamsters* framework, issues that require individualized inquiry—such as monetary damages or whether an individual is qualified—can be addressed at the second phase of the proceedings. CSX is wrong to argue that individual damages issues defeat predominance under Rule 23(b)(3) and cannot be managed through second-stage *Teamsters* hearings. If Plaintiffs' carry their first stage burden of showing that CSX engaged in a pattern or practice of disability discrimination, damages will then be resolved for individual class members including, where necessary, whether they were "qualified individuals" under the ADA. *See Bates*, 204 F.R.D. at 448-49 (resolving questions regarding class members' "particular limitations and essential job functions" in second-stage proceedings).

Other courts have found predominance under Rule 23(b)(3) and used the two-stage *Teamsters* framework to manage class discrimination class actions. *See, e.g.*, *Rollins v. Traylor Bros.*, 2016 WL 258523, at *15 (W.D. Wash. Jan. 21, 2016)10 (approving the use of individual second-stage proceedings in race discrimination class action); *Ellis*, 285 F.R.D. at 529 (certifying 700 member damages class and approving the use of *Teamsters* hearings to resolve "individualized questions with respect to any particular class member's entitlement to relief[.]"); *City of New York*, 276 F.R.D. at 48 ("Individual proceedings will be necessary to determine a particular claimant's eligibility to receive individual relief and what relief is available, questions relating to a claimant's

mitigation efforts, and to determine whether and to what extent the City's discrimination has caused a claimant noneconomic losses compensable under federal and state law.").

**(ii) Plaintiffs' Attendance Policy claims are well suited to class treatment as well.**

CSX only half-heartedly argues that Plaintiffs' claim that CSX CAPS attendance policy has a disparate impact on disabled employees is unsuited for class treatment. There, Plaintiffs challenge a discrete corporate policy and allege that the policy has the effect of discriminating against the disabled. In short, by making disabled employees ineligible to reduce their attendance points, CSX assures that disabled employees will be punished and terminated at a far greater rate than employees who are not disabled.

Disparate impact claims are routinely certified for class treatment, despite the need to resolve damages claims through bifurcated proceedings. *See, e.g., Gulino v. Board of Educ. of City Sch. Dist. of New York*, 2015 WL 5603020, at *7 (S.D.N.Y. Sept. 21, 2015); *Moore v. Napolitano*, 926 F. Supp. 2d 8, 33-34 (D.D.C. 2013); *Ellis v*, 285 F.R.D. 492, 536-537 (N.D. Cal. 2012); *Easterling v. Conn. Dep't of Corr.*, 2011 WL 5864829, at *8 (D. Conn. Nov. 22, 2011). And even if the Court found a Rule 23(b)(3) class inappropriate, the disparate impact claims raised here are well suited to certification under Rule 23(b)(2) for injunctive relief.

CSX's arguments that individualized issues will predominate miss the mark on this claim as well. CSX argues that determining whether a given employee should have had points removed from his record will require individualized proceedings. But such evidence can be presented as aggregate proof. The factfinder need not look further than CSX's records to determine which employees were otherwise eligible for a reduction in points but were disqualified for taking FMLA leave. To the extent any individualized issues exist at all in proving Plaintiffs' attendance policy claims, they can be handled at a second phase, if necessary, as contemplated by *Teamsters*.

### F. If the Court Finds Plaintiffs' Proposed Amended Complaint Deficient in Any Way, Plaintiffs Should be Afforded an Opportunity to Cure Any Deficiencies.

In the event that the Court finds Plaintiffs' proposed amended complaint deficient in any way, the Court should deny Plaintiffs' motion in relevant part without prejudice to give Plaintiffs the opportunity to correct any deficiencies identified by the Court. Leave to amend should be granted unless "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)); Garey v. Wal-Mart Stores East, LP, 2016 WL 1642945, at *6 (D. Md. Apr. 26, 2016) (permitted the plaintiff to file a second amended complaint to cure deficiencies identified by the court).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: August 2, 2018

Respectfully submitted,

s/ Adam W. Hansen
Adam W. Hansen (Admitted *Pro Hac Vice)*
Apollo Law LLC
3217 Hennepin Ave S
Suite 7
Minneapolis, MN 55408
adam@apollo-law.com

Nicholas D. Thompson (No. 20429)
The Moody Law Firm, Inc.
500 Crawford Street, Suite 200
Portsmouth, VA 23704
Telephone: (757) 393-4093
Facsimile: (757) 397-7257
nthompson@moodyrrlaw.com

P. Matthew Darby (No. 5980)
Berman, Sobin, Gross, Feldman
& Darby, L.L.P.

1301 York Road, Suite 600
Lutherville, Maryland 21093
Telephone: 410-769-5400
Facsimile: 410-769-9200
pmdarby@bsgfdlaw.com

**ATTORNEYS FOR PLAINTIFFS AND THE PUTATIVE CLASSES**